IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| NORTHVOLT AB, *et al.*,[1] | ) ) ) | Case No. 24-90577 (ARP) |
| Debtors. | ) ) ) | (Joint Administration Requested) |

### DECLARATION OF
### ANDREW YEARLEY IN SUPPORT OF
### THE DEBTORS' DIP MOTION AND CASH COLLATERAL MOTION

I, Andrew Yearley, make this Declaration pursuant to 28 U.S.C § 1746:

1.      I am the Global Co-Head of Restructuring at Rothschild & Co US Inc. ("Rothschild & Co"), a financial advisory services and investment banking firm, which has its principal office at 1251 Avenue of the Americas, 33rd Floor, New York, New York 10020. Rothschild & Co is the proposed investment banker to the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") in these chapter 11 cases.[2]

2.      I submit this declaration (this "Declaration") in support of the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying*

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Northvolt. The location of Debtor Northvolt AB's principal place of business is Alströmergatan N 20, 112 47 Stockholm, Sweden; the Debtors' service address in these chapter 11 cases is Northvolt AB c/o Stretto, Inc. 410 Exchange, Suite 100 Irvine, CA 92602. "Northvolt" or the "Company" refers to Northvolt AB together with its Debtor and non-Debtor affiliates.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Motion, the Cash Collateral Motion, or the *Declaration of Scott Millar, Senior Managing Director of Teneo, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") filed contemporaneously herewith, as applicable.

*the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "DIP Motion") and the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Use of the Debtors' Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Cash Collateral Motion"). As noted in the DIP Motion, the Debtors seek approval of a debtor-in-possession facility in an aggregate principal amount of $100 million provided by one of the Debtors' largest customers, Scania CV AB ("Scania" or the "DIP Lender," and the facility, the "DIP Facility"). Upon entry of the proposed interim order approving the DIP Facility (the "Interim DIP Order"), the Debtors would receive immediate access to $51 million. Upon entry of the proposed final order (the "Final DIP Order"), the Debtors would gain access to the remaining $49 million, to be released in two tranches. In addition to the DIP Facility, the Debtors also seek immediate access to cash collateral (the "Cash Collateral"), which includes approximately $110 million in a USD-denominated debt service reserve account held by Debtor Northvolt Ett (the "DSRA" and the cash therein, the "DSRA Cash").[3]

3. Except as otherwise indicted herein, all facts set forth in this Declaration are based upon (a) my personal knowledge of the Debtors' operations and finances; (b) my review of relevant documents; (c) information provided to me by employees of Rothschild & Co working with me or under my supervision; (d) information provided to me by, or discussions with, the Debtors' management team or the other advisors to the Debtors, including Kirkland & Ellis LLP

---

[3] Upon entry of the Interim DIP Order and the Interim Cash Collateral Order (as defined in the Cash Collateral Motion), the DSRA Cash shall be released, provided that $28 million (the "Remaining DSRA Cash") shall continue to be held in the DSRA until the share pledge over the shares held by Northvolt AB in Northvolt Batteries NA is granted in accordance with paragraph 22(c) of the Interim Cash Collateral Order, at which time such remaining funds shall be immediately released.

and Kirkland & Ellis International LLP (collectively, "K&E") and Teneo Capital LLC ("Teneo"); (e) my review of information provided to me by employees of Rothschild & Co's affiliate, N.M. Rothschild & Co Limited ("NMR"), which is advising the Debtors together with Rothschild & Co; and; (f) my experience as a restructuring professional. I am not being compensated specifically for this testimony other than through payments received by Rothschild & Co as a professional proposed to be retained by the Debtors. Specifically, I have overseen the Rothschild & Co team, which, since August 7, 2024, has been one of the principal advisors to the Debtors in connection with matters pertaining to this Declaration. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

## Background and Qualifications

4. Rothschild & Co is a member of one of the world's leading independent investment banking groups, with offices in more than forty countries. Rothschild & Co has expertise in domestic and cross-border restructurings, mergers and acquisitions, new capital raises, debt advisory, and other financial advisory and investment banking services. Rothschild & Co has extensive experience representing the interests of debtors, creditors, and institutional investors in business and sovereign restructurings and workouts both in and out of chapter 11 and has represented clients in a wide range of industries globally. Rothschild & Co is both a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation.

5. I am a Managing Director and Global Co-Head of Restructuring at Rothschild & Co. Over my 30-year career, I have provided investment banking services to debtors and creditors through in-court and out-of-court restructurings across a number of industries. My company-side

chapter 11 restructuring experience includes representing: Boston Market, Chassix Automotive, Conseco, Finova, Kodak, Libbey, Linn Energy, Loews Cineplex, Nortel, Plastech, Seventy-Seven Energy, Takata Automotive, Trump Casino, and Weatherford.  I have also represented creditor constituencies in numerous restructuring transactions, including in chapter 11 cases.  Furthermore, I have specific experience in chapter 11 bankruptcies, mergers and acquisitions, lender negotiations, and distressed financings.

6. Prior to joining Rothschild & Co, I worked at Lazard Inc. for 24 years, most recently as Managing Director of Restructuring and Capital Solutions.  Prior to Lazard, I was a Vice President in Deutsche Banc Alex Brown's Restructuring Group and spent five years in the Restructuring and Reorganization Group at Ernst & Young LLP.  I received a Master of Business Administration degree in Finance and Financial Management Services from Columbia Business School and a Bachelor of Arts degree (Phi Beta Kappa) from Duke University.

## Rothschild & Co's Retention

7. Rothschild & Co was initially engaged as corporate finance adviser to the Debtors in December 2023 to assist the Debtors in evaluating IPO and capital raising alternatives.  More recently, pursuant to an engagement letter, dated November 13, 2024, the Debtors expanded the scope of Rothschild & Co's engagement to include advising in connection with a potential restructuring, sale process and certain financing matters.  Specifically, Rothschild & Co has rendered investment services to the Debtors in connection with the evaluation of strategic and financial alternatives to improve their capital structure, liquidity, and overall financial position, including with respect to reviewing and negotiating the terms and conditions of their proposed DIP Facility and use of Cash Collateral.  Additionally, Rothschild & Co has worked closely with the

4

Debtors' management team and their advisors and has become well-acquainted with the Debtors' capital structure, liquidity needs, and business operations.

### The Debtors' Need for Postpetition Financing and Access to Cash Collateral

8. As of the Petition Date, the Debtors have approximately $30 million of available cash on hand, which, due to the capital-intensive nature of the Debtors' business, could only support the Debtors' operations for approximately one week. The Debtors' business requires significant expenditures to satisfy obligations to the Debtors' suppliers and workforce. As a result, the Debtors require immediate access to Cash Collateral and the infusion of cash under the proposed DIP Facility to, among other things, fund operational expenses (including payroll) and administer these chapter 11 cases.

9. Given the Debtors' current liquidity and operational needs, however, they cannot administer their chapter 11 cases based on the use of Cash Collateral alone. For that reason, the Debtors also require immediate access to the DIP Facility to allow the Debtors to pursue a fulsome chapter 11 process with sufficient liquidity to stabilize operations. Most importantly, the DIP Facility will provide the Debtors with the runway necessary to obtain additional financing. Absent access to Cash Collateral and the DIP Facility, the Debtors most likely would be forced to pursue an immediate liquidation—an outcome that would be detrimental to all stakeholders.

### The Debtors' Efforts to Secure Postpetition Financing

**A. The Shareholder Bridge Facility and the Stable Platform**

10. The Debtors enter these chapter 11 cases as a result of industrial headwinds and operational challenges that have significantly constrained their liquidity. Accordingly, over the past few months, the Debtors, with the assistance of me and my team at Rothschild & Co, NMR,

and the Debtors' other advisors, have worked diligently to secure interim financing that would improve the Debtors' liquidity position and bridge them to longer-term solutions, including a comprehensive corporate restructuring.

11. Starting in August 2024, the Debtors and their advisors initiated various negotiations with Prepetition Secured Lenders, major shareholders, and certain key customers, including Scania, to address the Debtors' immediate funding needs. The options discussed included (a) the release of funds held in restricted accounts pledged to the Prepetition Secured Lenders and (b) short-term financing provided by certain of the Debtors' shareholders and customers. Though short-term in nature, the Debtors pursued these options with the ultimate goal of bridging to a long-term recapitalization.

12. On August 7, 2024, the Debtors entered into a bridge facility (the "Shareholder Bridge Facility") with certain of their shareholders. Under the Shareholder Bridge Facility, the Debtors obtained $154 million of new money financing. In addition, the Shareholder Bridge Facility provided for additional borrowing capacity up to $750 million under certain circumstances (any such increase in bridge loan commitments, an "Accordion Increase").

13. After obtaining the Shareholder Bridge Facility, the Debtors continued to engage with their key stakeholders on a three-part financing proposal that would allow them to extend their liquidity runway (the "Stable Platform") while, at the same time, working towards a wider recapitalization plan. The Stable Platform was based on capital to be provided by three stakeholder groups and included funds provided by (a) certain of the Debtors' shareholders via an Accordion Increase under the Shareholder Bridge Facility Agreement, (b) the Debtors' key customers, including Scania, and (c) the Prepetition Secured Lenders through the release of the DSRA Cash.

The Stable Platform, if effectuated, would have been expected to provide the Debtors with sufficient liquidity to maintain reasonably normal operations until January 2025.

14. In October 2024, the Debtors received an initial "execution bridge" of approximately $50 million (the "Execution Bridge") under the Stable Platform proposal. The Execution Bridge consisted of (a) the release of $24.8 million in funds from the DSRA and (b) $24.8 million of unapplied proceeds under the existing Shareholder Bridge Facility. Unfortunately, despite the Debtors' efforts in engaging with the key stakeholders, it became clear in the beginning of November 2024 that the consensual resolution contemplated by the Stable Platform would not be achievable on the needed timeline.

### B. Negotiations with the DIP Lender and Prepetition Secured Lenders

15. After the Debtors realized that the Execution Bridge would not be achievable, they focused their efforts on raising emergency debtor-in-possession financing and securing the consensual use of cash collateral to bridge to a holistic recapitalization or going-concern sale transaction under a very compressed timeline with stakeholders located around the world, many of whom were unfamiliar with chapter 11. After extensive, hard-fought negotiations, the Debtors agreed with the DIP Lender on the terms and conditions of the DIP Facility, which were largely similar to those terms being negotiated under the Stable Platform. It's important to note that the DIP Lender is also a critically important customer to the Debtors, and its emergency support illustrates its commitment to the Debtors' products. In addition, the Prepetition Secured Lenders consented to the Debtors' use of Cash Collateral through the release of the DSRA Cash in exchange for adequate protection liens on certain of the Debtors' assets. While subject to extensive negotiation, the Prepetition Secured Lenders would not provide a release of the DSRA Cash

without additional collateral. Access to the DIP Facility and Cash Collateral will provide the Debtors with the necessary liquidity to fund critical operational costs and avoid an immediate, value-destructive liquidation.

### C. The Prepetition Marketing Process

16.  In parallel with the negotiations with the DIP Lender and Prepetition Secured Lenders, the Debtors, with the assistance of Rothschild & Co and NMR, launched a marketing process to explore potential third-party postpetition financing options.  In total, the Debtors contacted nineteen additional potential financing providers, all of whom are established lenders in the restructuring space with the ability to provide postpetition financing in distressed situations. In addition to third-party investors, the Debtors and Rothschild & Co engaged with other incumbent stakeholders, including the Northvolt AB convertible noteholders, the Second Lien Secured Lenders, and participants in the Shareholder Bridge Facility.  The Debtors entered into non-disclosure agreements with fifteen parties and provided a "teaser" confidential information memorandum to those parties.  Under an extremely tight timeline, Rothschild & Co and the Debtors provided prospective investors access to a virtual data room that housed a suite of diligence information on the Debtors and its assets.  The Debtors and Rothschild & Co made themselves available for questions and calls regarding the proposed financing.  The Debtors were ultimately unable to secure postpetition financing from these parties, due in large part to the expedited timeline required by the Debtors' immediate need for liquidity.  Based on this process, I believe the proposed DIP Facility represents the best, and only, available option for the Debtors' debtor-in-possession financing.  The terms of the DIP Facility and the access of cash collateral are

largely consistent with the terms agreed for the Scania bridge and the release of the DSRA Cash in the Stable Platform financing.

17. In order to maximize value for the benefit of all stakeholders, the Debtors will continue their outreach efforts in a broad marketing process to solicit investor(s) interest in (a) bidding on all or certain of Northvolt's assets, (b) providing DIP financing to extend the Debtors' runway to explore a long-term solution, and/or, (c) serving as a plan sponsor or an exit financing party. The Debtors are pursuing all paths available in order maximize value and drive competitive tension under a compressed timeline.

18. After the Petition Date, the Debtors plan to continue the marketing process to obtain additional financing necessary to support operations during these chapter 11 cases and provide the Debtors with runway to explore long-term solutions. In parallel, the Debtors will work constructively with their creditors, shareholders, the DIP Lender, and other key stakeholders on a comprehensive, value-maximizing restructuring transaction that will include a sale process for certain of the Debtors' assets. In my opinion, the Debtors have a reasonable likelihood of receiving postpetition financing as a result of these efforts.

**The Terms of the Proposed DIP Facility Are Reasonable**

19. The proposed DIP Facility is a senior secured superpriority new money multiple draw debtor-in-possession term loan facility in the aggregate principal amount of $100 million consisting of: (a) Upon the entry of the Interim DIP Order, one draw in the principal amount of $51 million; and (b) upon the entry of the Final DIP Order, two draws in the amounts of $25 million and $24 million, respectively (all draws collectively, the "DIP Loans").

20. In connection with the DIP Facility and the Interim DIP Order, the Debtors have agreed to grant liens on certain unencumbered property and to pay interest and certain fees to the DIP Lender. In particular, as described more fully in the DIP Credit Agreement, the Debtors have agreed to pay:

    a. ***Interest Rates***. The Debtors will pay 16% per annum until February 14, 2025, and, thereafter, 18% per annum. Interest shall be payable monthly in arrears. There will be a 2.00 % increase in rate upon default and a 2.00 % increase on overdue amounts.

    b. ***Commitment Fee.*** The Debtors will pay 30% of the interest rate as a commitment fee if the unused portion of the aggregate amount of commitments that is available under the DIP Facility (the "DIP Commitments") is extended as a DIP Loan. This translates to 5% of $49 million ($2.45 million).

    c. ***Structuring Fee.*** The Debtors will pay $1 million upon the first draw of the DIP Facility and another $1 million upon the earlier of (a) the consummation of a plan of reorganization with respect to these chapter 11 cases, (b) the maturity date of the DIP Facility, (c) the acceleration of the DIP Obligations, or (d) the payment in full of the DIP Loans and termination of the DIP Commitments.

21. Further, under the Interim DIP Order, the Debtors would provide the DIP Lenders with (a) super senior, first priority lien and security interest in (i) substantially all assets and properties of Northvolt Labs AB, including all equity issued by Vasteras Effekten 2 AB (the "Labs PropCo") and certain movable assets and buildings of Northvolt Labs AB located at Labs PropCo; (ii) the equity issued by Northvolt Labs AB and all intercompany receivables owing by Northvolt Labs AB to Northvolt AB; and (iii) certain moveable assets and buildings owned by Northvolt AB located at real estate owned by Labs PropCo; and (b) a second priority lien and security interest in those assets that secure the Adequate Protection DSRA Claims, including, without limitation, (i) a pledge of all intercompany receivables held by Northvolt AB in Northvolt Revolt AB, Northvolt

Systems AB, Northvolt Fem AB, and Northvolt Batteries North America Inc. (subject only to the consent of applicable Canadian authority).  All such collateral shall be subject to the Carve Out (as defined in the Interim DIP Order).

22. I believe that the economic terms contemplated under the proposed DIP Facility are reasonable in this market and were necessary to induce the DIP Lenders to provide such financing. The terms of the DIP Facility, including the interest rates and fees, were the subject of arm's-length and good-faith negotiations between the Debtors and the DIP Lender.  During the negotiations, the Debtors were represented by experienced bankers and financial advisors and sophisticated restructuring counsel.  Although the Debtors negotiated, among other terms, the proposed fees, they ultimately determined that they could not secure DIP financing and obtain access to the necessary liquidity to preserve the business value on terms better than the contemplated fee structure.  Given the financial and operating condition of the Debtors, the timing, cost, and risk of administering these chapter 11 cases, the lack of any viable alternatives, my experience as a restructuring professional, and my knowledge of the market for DIP financing, I believe the terms of the DIP Facility, including the interest rates and fees, are reasonable under the circumstances. The DIP Lender conveyed to the Debtors that it would not extend financing without these terms, and no other reasonable alternatives are available.

### The Proposed DIP Facility is the Best Postpetition Financing Arrangement Currently Available to the Debtors

23. Based on my experience with debtor-in-possession financing transactions and my involvement in the efforts to secure postpetition financing for the Debtors, I believe the proposed DIP Facility, taken as a whole, is fair and reasonable under the circumstances and represents the

only currently available financing option under the facts and circumstances of these chapter 11 cases.

24. ***First***, the proposed DIP Facility is expected to provide the Debtors with access to the amount of capital that is necessary to continue critical operations as they pursue longer-term solutions. The DIP Facility would preserve the Debtors' enterprise value by enabling the Debtors to (a) make payments with respect to contractual arrangements with the DIP Lender for production and deliveries of the DIP Lender of battery cells as per delivery contracts and activities related thereto, (b) fund the costs and expenses relating to the DIP Facility, and (c) fund reasonable costs and expenses related to the DIP Collateral as specifically identified in the DIP Budget.

25. ***Second***, the terms of the proposed DIP Facility are the result of the extensive, hard-fought negotiations and the marketing process described above.

26. ***Third,*** the Debtors, with the assistance of their advisors, solicited and considered other sources of postpetition financing. Ultimately though, the Debtors were unable to secure any alternative postpetition financing proposals from these other sources.

27. ***Finally***, the principal economic terms proposed under the DIP Facility are customary for debtor-in-possession financings of this type. In my view, the specific economic terms were negotiated at arms'-length, are an integral component of the overall terms of the DIP Facility, and are, in the aggregate, reasonable and represent the best terms available to the Debtors under the current circumstances.

**The Adequate Protection Provided to the Prepetition Secured Parties is Reasonable**

28. In connection with the release of the DSRA Cash and the Interim Cash Collateral Order, the Debtors have agreed to grant liens and claims on certain assets and to pay interest and

certain fees to the Prepetition Secured Lenders. In particular, as described more fully in the Interim Cash Collateral Order, the Debtors have agreed to pay the following in regard to the Adequate Protection DSRA Claims:

  a. *Interest Rates*. The Adequate Protection DSRA Claims will accrue interest 16% per annum.

  b. *Fees.* The Adequate Protection DSRA Claims will (i) accrue a 1% entry fee upon entry of the Interim Cash Collateral Order and (ii) accrue a 2% fee upon the earlier of replenishment of the DSRA and the Outside Milestone (each as defined in the Interim Cash Collateral Order).

29. In each case, the interest and fees above shall be paid in kind in the form of additional Adequate Protection DSRA Claims secured by the Adequate Protection DSRA Liens (as defined below).

30. In exchange for the release of the DSRA Cash, the Debtors' Prepetition Secured Parties require customary forms of adequate protection, including (a) to the extent of any diminution in value of the Prepetition Collateral, replacement liens and superpriority claims on the Prepetition Collateral and unencumbered assets of Northvolt Ett AB; and (b) additional liens on certain of the Debtors' unencumbered assets, including (i) first ranking intercompany loan pledge over all intercompany loans owed to Northvolt AB by Northvolt Revolt AB, Northvolt Systems AB, Northvolt Fem AB and a second ranking intercompany pledge over all loans owed to Northvolt AB by Northvolt Labs; (ii) first ranking share pledge over the shares held by Northvolt AB in Northvolt Revolt AB, Northvolt Systems AB, Northvolt Fem AB, and Northvolt Batteries North America Inc. (subject only to consent of the applicable Canadian authority, which consent the Debtors undertake to procure as soon as reasonably practicable, but no later than 14 days after the Petition Date) and third ranking share pledge over shares held by Northvolt AB in Northvolt

Labs (junior only to (x) the Senior DIP Liens (as defined in the Interim DIP Order) and (y) the claims and liens with respect to the release of $24.8 million of Cash Collateral in the DSRA prior to the Petition Date); and (iii) first ranking security over certain assets and other property at Northvolt Revolt AB and Northvolt Systems AB and its Debtor subsidiary, and second ranking security over all assets and other property constituting DIP Collateral (as defined in the Interim DIP Order) subject to the Senior DIP Liens, which property is not otherwise described in the preceding clauses (i) and (ii) (the "Adequate Protection DSRA Liens").

31. As further adequate protection, pursuant to the Interim Cash Collateral Order, the Debtors also agreed to pay reasonable and documented fees and expenses of the legal and financial advisors of the First Lien Secured Lenders and Second Lien Secured Lenders (with respect to the Second Lien Secured Lenders, subject to certain limitations specified in the Interim DIP Order). I believe the Debtors' provision of the proposed forms of adequate protection is reasonable under the circumstances of these chapter 11 cases and is necessary to obtain the Prepetition Secured Parties' consent to the release of the DSRA Cash.

## Conclusion

32. For the reasons stated above, I believe that the terms of the DIP Facility and the use of Cash Collateral are reasonable under the circumstances and were the product of good faith, arms'-length negotiations.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: November 21, 2024  
New York, New York

/s/ *Andrew Yearley*  
Andrew Yearley  
Managing Director  
Global Co-Head, Restructuring  
Rothschild & Co US Inc.