IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 24-90577-11 |
| | § | HOUSTON, TEXAS |
| NORTHVOLT AB, | § | THURSDAY, |
| | § | NOVEMBER 21, 2024 |
| DEBTOR. | § | 4:02 P.M. TO 5:52 P.M. |

**FIRST DAY HEARINGS (VIA ZOOM)**

BEFORE THE HONORABLE ALFREDO PEREZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                          SEE NEXT PAGE

ELECTRONIC RECORDING OFFICER: AKEITA HOUSE

COURTROOM DEPUTY:                     AKEITA HOUSE

**(No log notes provided; Audio issues noted.)**

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES (VIA ZOOM):**

FOR THE DEBTOR:                      KIRKLAND AND ELLIS
                                     Chris Greco
                                     Ciara Foster
                                     Margaret Reiney
                                     Jimmy Ryan
                                     601 Lexington Avenue
                                     New York, NY  10022
                                     1-212-446-4800

                                     Jack Luze
                                     333 West Wolf Point Plaza
                                     Chicago, IL  60654
                                     1-312-862-2000

FOR U.S. TRUSTEE:                    OFFICE OF U.S. TRUSTEE
                                     Ha Nguyen
                                     515 Rusk Street, Suite 3516
                                     Houston, TX  77002
                                     1-713-718-4655

FOR AD HOC COMMITTEE OF              PAUL, WEISS, RIFKIND, WHARTON
SECOND LIEN LENDERS:                 Alice Belisle Eaton
                                     1285 Avenue of the Americas
                                     New York, NY  10019
                                     1-212-373-3000

FOR DIP LENDER:                      FRESHFIELDS US, LLC
                                     Scott Talmadge
                                     3 World Trade Center
                                     175 Greenwich Street
                                     New York, NY 10007
                                     1-212-277-4000

FOR PRE-PETITION FIRST               MILBANK, LLP
LIEN SECURED PARTIES:                Matthew L. Brod
                                     55 Hudson Yards
                                     New York, NY  10001
                                     1-212-530-5000

(Please also see Electronic Appearances.)

**INDEX**

| DEBTOR'S EXHIBITS: | Offered | Received |
|---|---|---|
| Docket Number 4 | 27 | 28 |
| Docket Number 28 | 27 | 30 |
| Docket Number 29 | 27 | 28 |

***

**HOUSTON, TEXAS; THURSDAY, NOVEMBER 21, 2024; 4:02 P.M.**

THE COURT:  This is Judge Perez.  We're here on the First Day Hearings of Northvolt, Case Number 24-90577.

Please go to my webpage and make your appearance.  That's how we keep track of appearances.

And I'm going to ask everyone to please mute their phones.  There's a lot of background static.  I'd rather not go to the hand-raising feature if we don't have to.  But if it becomes a problem I will do that.

So, all right, why don't we get appearances of counsel, and then we can begin.

(Pause)

MR. GRECO:  Judge Perez, can you hear me?

THE COURT:  Yes, I can hear you, very faintly though.

MR. GRECO:  Good afternoon, Judge.  This is Chris Greco from Kirkland and Ellis, proposed counsel for the Debtor.

THE COURT:  Good afternoon, Mr. Greco.

Anyone else wish to make an appearance?

MR. NGUYEN:  Good afternoon, Your Honor, Ha Nguyen for the U.S. Trustee.

THE COURT:  Good afternoon, Mr. Nguyen.

Anyone else wish to make an appearance?

(Pause)

MS. EATON:  Good afternoon, Your Honor.  Alice Eaton with Paul Weiss on behalf of the Ad Hoc Committee of Second Lien Lenders.

THE COURT:  Good afternoon, Ms. Eaton.

Anyone else?

MR. BROD:  Good afternoon, Your Honor --

MR. TALMADGE:  Your Honor, this is Scott Talmadge from Freshfields, Bruckhaus, Deringer -- sorry, Freshfields U.S., LLC.  We just changed our name.  For Scania CV AB, the proposed DIP lender here.

MR. BROD:  Your Honor, can you hear me okay?

THE COURT:  I can hear you fine, Mr. Brod.

MR. BROD:  Good afternoon, Your Honor.  Matthew Brod from Milbank, LLP on behalf of the Prepetition First Lien Secured Parties.

THE COURT:  All right.  Anyone else?

(No audible response.)

THE COURT:  Okay.  Before we get started, I -- as many -- as most of you know, I retired from Weil Gotshal at the end of last year.  And judicial disqualification is governed by 28 USC 455 as that made applicable under Bankruptcy Rule 5004.

So to the extent that my former firm is an active participant in the case, I will recuse myself.  I don't think that's the case now.  But to the extent anyone wishes

6

to bring that up at any time, I'm happy to consider it.  But I just wanted to put that on the record before we went forward.

All right.  Mr. Greco.

MR. GRECO:  Thank you, Judge.  Can you hear me okay?

THE COURT:  I can hear you fine, yes, sir.

MR. GRECO:  Thank you.  Again, Your Honor, for the record, Chris Greco from Kirkland and Ellis, proposed counsel for the Debtors.

And, Your Honor, I know you've been on the bench a few months now.  I just wanted to say it's an honor to be in your courtroom.  We appreciate it.

THE COURT:  Thank you.

MR. GRECO:  Your Honor, I want to start with just some very quick thank you's.  Of course to the Court, I know you're hearing us on extremely short notice.

There are always short notice first day hearings. This one is extremely short.  It is, as you will hear, for good reason.  But we do -- but we still appreciate it, and so thank you.

Your Honor, I'd also like to thank the Office of the United States Trustee.  They've, as they always do, have spent a lot of time with us reviewing our pleadings, working through issues.

And they've been very transparent with us, and we appreciate that.  So thank you to the Office of the United States Trustee for their efforts as well.

Your Honor, I'm joined today by some of my colleagues from Kirkland and Ellis will also take the podium after me, as well as our co-counsel, Haynes and Boone.  Mr. Beckham is on the line.

I -- my colleagues from Kirkland, Jack Luze, Ciara Foster, Margaret Reiney, and Jimmy Ryan will all take the podium after I finish.

If it pleases the Court, Your Honor, we do have a presentation as is customary that we'd love to run through which gives some background on Northvolt.  If the Court would allow Kirkland (indiscernible) presentation to take control (indiscernible).

THE COURT:  All right.  They're the presenter.

MR. GRECO:  Okay.  Just one moment while we pull that up.  I appreciate it.

Your Honor, can you see the slides?

THE COURT:  I cannot see the slides.  And I checked and they are the presenter.

MR. GRECO:  Apologies.  Just one second.  Wouldn't be a first day hearing if we didn't start with a tech issue, Your Honor, so --

THE COURT:  Okay.  There.  All right, I see it

now.

MR. GRECO:  Wonderful.  So, Your Honor, I'll give some background on Northvolt; really a fascinating company and excited to tell the (indiscernible) about it.

I'll run through these slides and then I'll pass the podium to Mr. Luze who will then cover the DIP and proposed cash collateral orders after me.  Make sure the clicker's working.

Okay.  Your Honor, so just as a road -- sorry, little bit of a delay there.  Just as a road map of what I'll cover, I'll just give a brief introduction (indiscernible) done.

I'll highlight some of the key members of Northvolt management, as well as the board of directors, which has been extremely active here in the lead up to the filing, and will continue to be so after the filing.

I'll talk about who Northvolt is, how it got into this situation, which you could phrase as events leading to the filing.  We use the term losing charge, a little play on words.  And then powering up what we're playing to do about it, how we got here.  So that's our agenda for these slides.

MR. SPEAKER:  (Indiscernible).

MR. GRECO:  Okay.

THE COURT:  All right.  Listen, hold on a second. I'm going to active the hand-raising feature.  So why don't

we do that?

(Pause)

MR. GRECO:  Okay, Judge.  I think I'm unmuted again; is that right?

THE COURT:  No audible response.)

MR. GRECO:  Your Honor, we can't hear you.

(Pause)

THE COURT:  All right.  How about now?  I unmuted myself.

MR. GRECO:  Yes.

THE COURT:  Okay.

MR. GRECO:  Thank you, Judge.  All right, I'll --

THE COURT:  Okay.

MR. GRECO:  -- (indiscernible) get moving along here.

So, Your Honor, we -- Northvolt is a battery maker that is headquartered in Sweden but (indiscernible) all over Europe, as well as North America.

And their goal is to be the greenest battery on the planet, and also to be a manufacturer of batteries for the automotive industry, among other industries, but especially the automotive industry.

It was founded in 2015 by two former Tesla executives.  The idea was to bring battery production at scale to Europe.

Currently most of the world's batteries are made in Asia. And so this was viewed as a very strategically important company, particularly for Europe but also as you'll hear in North America now as well as they have a major project that they'd like to move ahead with Canada as well that's been permitted and there's money behind.

But that's -- the company was founded in Sweden. Its headquarters are in Sweden. And I'll talk about that more in a minute.

Let me just highlight some of the key folks in management. And we have some of these folks on the line, although it's seven hours ahead where they are.

So on this slide, Your Honor, in the bottom left, Mr. Millar, Scott Millar from Teneo, the company's financial advisor. There are two Declarations in support of the first day relief today that Mr. Millar has put in.

He's on the line, available for cross-examination. In a few minutes Mr. Luze will move his Declaration into the record and he'll be available for cross.

The other members of the management team are all I believe listening but they're not witnesses today.

Your Honor, we highlight the two lead entities in the structure. There are nine Debtors (indiscernible) Chapter 11 cases that are being jointly administered here.

Northvolt AB is the parent board in the structure.

And there are currently six members of the board of directors of Northvolt AB.  Mr. Johnson chairs the board.

Mr. Selig is a new advisor to the board and may become a full-blown member of the board in short order.  But he's been joining board calls in the lead up to the filing.

And Mr. Selig, as the Court may be familiar with, has significant restructuring and turnaround experience.

We also highlight the Ett entity.  So Ett means one in Swedish.  And Northvolt Ett is you could think of it as the op co in the structure.

And there are two directors there.  Mr. Carlsson is the co-founder of the whole business.  And Mr. O'Donnell is new, became independent director at -- in the leadup to the filing.

But you'll hear the term Ett used because as you'll see in a minute when I put up the corporate restructure chart, Ett being the op co has some of the project level debts.

So when we refer to the first lien, which are represented by Milbank and PJC, and when we refer to the second lien, who are represented by Paul Weiss and Evercore, we're referring to that op co debt at Ett that exists.

And they are also, as you'll hear from Mr. Luze, the parties that are providing for consensual use of cash collateral at today's hearing.

I mentioned a few of these.  But, Your Honor, for the proposed advisors for the company, Kirkland and Ellis and Haynes and Boone are co-counsel to the company.

Teneo is the turnaround operational financial advisor for the company.  And Mr. Millar is leading that engagement for Teneo.

Mannheimer is the Swedish co-counsel for the company.

Stretto is the proposed noticing and claims agent.

Rothschild is the investment banker.

And then Allen and Overy Shearman has been project finance counsel for the company in the leadup to the filing.

And just to highlight what I -- some of which I've already mentioned in terms of the other key stakeholders, and particularly for today's hearing there will be other stakeholders I'll talk about throughout the case.

But for today on the lefthand column there is Scania.  So Scania is a trucking company that is a subsidiary of the German automaker Volkswagen.

Scania, in addition to being one of the most important customers of Northvolt, is supporting the company with a proposed DIP financing loan that Mr. Luze will present in a moment.  And they're being advised by Freshfields.

The first lien lenders, as I mentioned, Your

Honor, advised by Milbank and PJC are consenting to cash collateral use.  And the second lien lender's also consenting advised by Paul Weiss and Evercore.

There are other parties.  Your Honor mentioned Weil.  Weil represents Goldman Sachs who's a significant shareholder, and they have a board seat at the parent.

Volkswagen also is a significant shareholder and convertible noteholder.  And so there's a number of other parties.

Porsche's a significant customer, I believe represented by Simpson Thatcher.  So there are other parties in interest you'll hear about more as the case goes on.

But for purposes of today's expedited hearing I think the key players to highlight are the DIP lender's counsel and the cash collateral lender advisors.

Little bit about who Northvolt is.  So the company, as I mentioned, founded about a decade ago in 2015 by two former Tesla executives who, as I said, their goal was to end Europe's dependence on foreign battery production.  That still is the goal.

And to address the unsustainability of existing battery manufacturing, and to do it in a green way.  So they're very focused on recycling and being both, you know, the supplier but also in a green and environmentally friendly way.

And this was -- this idea really took off.  And they've raised billions and billions of dollars to support this idea.

So it all started around 2015.  They went public with their ambitions in 2017.  And then beginning in 2017 -- and I'll just quickly click through here, I won't cover every bullet in this timeline.

But they started developing their labs and their first big gigafactory, which is the Northvolt Ett, as I said means one, which is in northern Sweden.  So the -- that facility in northern Sweden in Skelleftea, Sweden is really the primary manufacturing facility.

But they also have projects as I click through here I'll flag.  Sorry, it's a little slow on my end.

They have projects that are ready to go in Germany, which is named Drei, which is German for three.

A project in Polland.  They have a project in Canada which is named six.  And that project in Canada is also ready to go.  The company still very much supports that.

And I'd highlight as well for the Court and for potential investors who might be looking at Northvolt that those projects really do have the support of the governments in Canada and Germany.

And they also have permits and money lined up.  So

they're really bullish about those projects getting off the ground in Canada and Germany, as they've done already in Sweden.

Let me move off the timeline.

So importantly the workforce and the reason for the urgency today, Your Honor, is we do have a payroll run. And with a seven-hour time difference, we're trying to get these employees paid on time Monday morning.

And so there's 6500 employees still at the company. They have downsized a little bit in the leadup to the filing. About a quarter the workforce had already been let go.

But 6500 is still a very significant workforce that's absolutely vital to the company. So you'll hear the wages motion Ms. Foster present in a minute. That's a really important motion for today.

Just to show geographically, you know, the global reach here of Northvolt, you'll see where Skelleftea is in northern Sweden. About this time of year it's only light for a few hours a day up there. But that's where the main factory is, Ett.

You see just north of Stockholm is the lab facility, another important facility that is also part of the collateral for the Scania DIP loan. Stockholm is corporate headquarters.

There -- highlights their facility Drei, number three, in Germany.  And then six, outside of Montreal in Canada.

And then also highlights what they were starting to do in the U.S., although it is not currently going forward, but in California, Silicon Valley, as well.

Given the time I'm going to move through quickly some of these slides here.  But just really fantastic facilities that they've had built here.

And that's an aerial of the facility in Skelleftea, Sweden and Ett, primary manufacturing facility where they're making batteries.

That's the last facility just north of Stockholm.

This is in Polland.

And there's a little bit of detail in the first day Declaration of Mr. Millar, Your Honor, on each of these and what they do more specifically.  But I won't go in it -- into it today on opening.

And then this is a rendering so not to mislead. This is what it's going to look like in Germany.  The others were real and (indiscernible), but as I said, still has the support here and money backing it.  So this is going to be in process.

And also a rendering in Canada.  But, again, the support of the government -- and I think even in the leadup

there's been a ton of press just in the last few hours since it's filed, Your Honor.

There have been some governments that have already made statements that they're rooting for this and they're rooting for Northvolt's success, including I saw I think from the Deputy Prime Minister in Sweden, but also I think Germany, Canada.  So we're excited about their support.

Revolt goes to the green initiative, you know, portion of the company.  But, you know, there also -- have invested in battery recycling.  So they're not only seeking to be a important battery producer but also do it in an environmentally responsible way.

Let me talk about the customers for a minute, which is obviously very important because it's a great story.  But you need customers for it all to work.

So three of the customers on here I would just note are different subsidiaries of Volkswagen.  So, you know, one Volkswagen has a significant shareholder, 20 percent or so of the equity, also convertible noteholder.

Scania, Porsche, and Audi are all different divisions, but they have their own board and they can make their own decisions in a lot of ways.  But they are all fall under the Volkswagen umbrella.

Scania's a DIP lender.  Although, you know, we are optimistic, and we still have contracts with Porsche and

Audi, and we think that they're an important part of the story here, obviously what needs to come together, though, is the financing.

And we need to bring new capital and bring a new investor or investors to the table.  And then I think the customers will be there.

And but just to highlight a few of the important ones.  There are other companies that you've heard of like Volvo, BMW that have been connected to Northvolt in its history.

And we're hopeful that folks would come back to the table if we are able to bring kind of the money here and new investors to recapitalize the business.

But these are just to highlight a few of the customers.

And Epiroc, which is about electric mining, which makes these vehicles for mining.

So just a few other aspects of the business.  I talked about automotive, but they also do things like providing moveable, scalable tower for concerts, festivals, other entertainment.  And so the -- not just automotive but there's other parts of the story as well.

Okay.  Let me just pause for a minute on the corporate org. chart.

You'll note here, Your Honor, so there's nine

entities that are part of these Chapter 11 cases.  There's obviously a lot more than nine on this chart.

So we were -- you know, we evaluated with the various boards which entities would need to be a part of the Chapter 11 cases both in terms of usual analysis, Your Honor, like who's on the debt and who would need to be supports in part of this restructuring.

And so we concluded and evaluated that nine entities did.  Several are U.S., several are Swedish entities as well.

But I'll just highlight for the Court -- and I've had a conversation with the U.S. Trustee about this -- each of the nine entities satisfies eligibility under Section 109 as property in the United States, a minimum of a thousand dollars in the bank account in each of them.

And there is a Texas entity newly formed to ensure Texas venue.

We know in Mr. Millar's first day Declaration, in paragraph 53 that we'll move into the record in a minute, but we walked through this in a little bit more detail about the property in the U.S., as well as the Texas entity and the retainer money, including Haynes and Boone's retainer in Texas.

And just to make clear, we're not running from any venue.  This is a company that was eligible to file in the

U.S.  And our stakeholders and our board determined that Chapter 11 was the best forum to attract the capital needed to recapitalize the business.

We expect, as has been done in many of these other international restructurings, that there will likely be a parallel proceeding in Sweden.  It's not been commenced contemporaneously with the filing.

But we do anticipate that we would have a Swedish reorganization.  It's a relatively new law they have in Sweden.  And we would be filing that when we have a little bit more line of sight into the timeline here of the case.

You know, what we're effectively doing, you know, from kind of a 30,000-foot level is we're getting in the Chapter 11 with cash collateral use and a DIP.

That buys a couple of months of time.  But we really need to hit the -- pound the pavement to find the broader financing.

And I expect to come back to the Court in as early as a few weeks, but a month or so, and hopefully have supplemental financing that will bridge us to the broader recap and things like a plan of reorganization.

I think when we get to that stage we're going to be closely working with Swedish counsel.  And at some point we will be commencing a Swedish reorg.  We need to do that anyway to restructure the equity.

But we're monitoring, you know, all the different jurisdictions that we operate in, making sure that our directors and officers comply with their applicable fiduciary duty.

And so I just wanted to flag for the Court that that's something you'll hear more about in the future, but not a contemporaneous parallel proceeding.  But I expect one to follow in the months to come.

Your Honor, this just shows a complex capital structure here.  This shows some of the convertible debt that sits up at AB.  It also shows some of the secured debt down at the Ett level.

In total, about six billion-ish of debt (indiscernible) of funded debt in the structure.  There's also been other money raised, you know, over the years.  Over the last decade they've raised, you know, close to $10 billion here for this business.

So -- but this is as we see it as of the petition date, a little under six billion of total debt, if you include the convertible debt and the Ett secured debt.

Your Honor, how did we get here?  In some ways I'd say there are the things that affected the company, operational, for example.  It's in a ramp-up phase.  It's a capital-intensive business.  There have been snafus just in terms of delivering batteries, meeting customer orders.

But even more than the company's own operational issues -- and they're addressing those, as I mentioned. They brought Teneo in who's providing guidance, and they're addressing all that with management expertise.  They brought additional expertise in.

On top of that, though, there's really a macro story here as well, which is if you just look at this chart, what's happened with EV sales.

I think the long-term story, though, is the world is still going EV.  It's just it's pumped the brakes a little bit on it.  So I think that, you know, the ramp-up here, if you just look at the bar chart, was following that. And then in 2023 it kind of dropped off a cliff.

And so obviously that has impacted things like the customer's reactions in their orders and their needs.  And so, you know, a big part of the story besides the operational issues, it's also just macro demand changing.

On top of that you have overcapacity and competition from Asia.  So as I said, I think it's close to 80 percent of batteries come from Asia.

And so while the -- a lot of the automakers have pumped the brakes on EV, which has impacted customer orders, Asia has in some ways flooded the market and has to date a lower cost.

So those are kind of big picture the reason for

this company's struggles.

But I think what you'll hear -- and this is why I think we still have reason for optimism, that we'll be back to the Court, you know, proposing a full recapitalization of its business and be able to save Northvolt and these jobs, is that the story and the reason for Northvolt to exist really still exists.

We are still going to need a battery maker in Europe, in Canada, in Germany.  And I think that the governments believe that.

I think that the lenders who invested in this believe that.  And I think that a lot of the shareholders who've invested in Northvolt over the years believe that as well.

We weren't able to cobble together, you know, a bridge financing that would extend our runway out of court much longer than we did.  But there are I can say a lot of investors that are still very supportive of this name.

And I think that when we couple that with bringing in a new strategic or financial investor over the coming weeks, we anticipate that we'll be able to, you know, bring that enthusiasm that already exists around the table and couple it with the new money and recapitalize (indiscernible).

I talked a little bit about some of the things

that we've done.  I should just note there was -- there's also a subsidiary called Ett Expansion.  That entity is in a Swedish insolvency proceeding.

Sweden has two types of insolvency proceedings. They have what they refer to as bankruptcy or insolvency, which is our equivalent of a Chapter 7 with a trustee.  Ett Expansion is in that proceeding and has a trustee.

They also have the Swedish reorganization process more akin to a Chapter 11 proceeding in the U.S.  It is the reorganization process that we hope to utilize for the other nine entities that are part of this proceeding over the coming months.

But I just note that there is an affiliate, Ett Expansion, that is in a Swedish insolvency proceeding at the moment.

Almost done here, Your Honor.

In the leadup to the filing we did everything we could to extend the runway.  We did everything we could to try to find an out-of-court solution.

We negotiated with our existing stakeholders. Really we thought of it as kind of three legs to the stool: customers, the investors/shareholders, and the lenders.

We weren't able to pull off what we had referred to as the stable platform, which would have been basically a three or four-month bridge financing out of court that would

have bought us more time to come in if we had to come in to a proceeding at all, which would have bought us more time to come in with more of a prearranged, prepackaged plan.

That -- those negotiations broke down a few weeks ago and we had to pivot, and so we did.  We pivoted to cash collateral negotiations and DIP negotiations.

And fortunately Scania, our customer, really stepped up in the DIP negotiations, and we appreciate that. And our lenders really stepped up.

And I know this was difficult for all the institutions and all the advisors, but I just compliment everybody involved here.

This was really an amazing joint effort literally around the clock with all the different time zones involved here, Your Honor, but that we're able to come to court after having a bridge financing fall apart just a few weeks ago with so much consensus on the first day.

I won't say there's perfect consensus for the whole case.  And there probably will be issues to come.

But to come into a situation where just a few weeks ago our bridge financing fell apart and we have nearly a hundred percent of our first and second lien lenders supporting us with cash collateral, and a customer, key customer supporting us with the DIP, and shareholders and investors standing by still very interested, we're proud of

the progress we made in just these last couple of weeks to get into Chapter 11.

Your Honor, I will cede the podium to my partner Mr. Luze who will move three Declarations into evidence. And then Mr. Luze will handle the proposed DIP and cash collateral motion.

Your Honor, any questions for me before I cede the podium to Mr. Luze?

THE COURT:  No, thank you very much.  I thought that was very helpful.

I did have a chance to review all three of the Declarations.  I found Mr. Millar's first Declaration to be very helpful.

And I had noticed paragraph 53 which forms the basis of the having appropriate venue in the Southern District.

MR. GRECO:  Thank you, Your Honor.  I'm going to pass it to Mr. Luze now.

MR. LUZE:  Good evening, Your Honor.  Jack Luze from Kirkland and Ellis on behalf of the Debtors.  Can Your Honor hear me okay?

THE COURT:  I can hear you fine.  Thank you.  Good afternoon, Mr. Luze.

MR. LUZE:  Thank you, Your Honor.

Your Honor, I'll be taking the agenda items

numbers one and two on the agenda.  That is the Debtors' cash collateral motion and the Debtors' DIP financing motion.

Before I do that, Your Honor, I would like to move into evidence the two Declarations of Mr. Millar which are at docket numbers number four, which is the main first day Declaration, and 29, which is Declaration tailored to cash collateral use and need for financing.

As in addition to Mr. Millar's Declarations I would move in the Declaration of Mr. Yearly, which is found at Docket Number 28, which primarily is in support of the DIP financing.

Those three Declarations, Your Honor, will provide the evidentiary support for the balance of the hearing.

Mr. Millar and Mr. Yearly are both in the virtual courtroom and available for cross-examination.

THE COURT:  All right.  Let me first start with the first day Declaration found at Docket Number four, which is Mr. Millar's Declaration with respect to the case, you know, the traditional first day Declaration.

Does anyone have any objections to the admission of this Declaration for purposes of this hearing?

(No audible response.)

THE COURT:  All right.  Hearing none I will admit that Declaration.

(Docket Number 4 was received in evidence.)

THE COURT:  Does anyone wish to cross-examine Mr. Miller on this?

(No audible response.)

THE COURT:  All right.  Then we'll move on to Mr. Millar's second Declaration which focuses on the budget and other items in connection with the DIP and the cash collateral found at Docket Number 29.

Does anyone have any objections to the admission of Mr. Millar's Declaration found at Docket Number 29 for purposes of this hearing?

(No audible response.)

THE COURT:  All right.  Hearing none I will admit the Declaration.

(Docket Number 29 was received in evidence.)

THE COURT:  Does anyone wish to cross-examine Mr. Millar with respect to his Declaration found at 29?

(No audible response.)

THE COURT:  All right.  Let's move on to -- yes.

MR. TALMADGE:  This is Scott Talmadge with Freshfields on behalf of Scania.

With regard to the Declaration of Mr. Miller on the budget, we are working out what the actual budget is with the Debtors.

There's a little bit of a discrepancy, and I

didn't want to lose that.  Not objecting, Your Honor, at this moment in time; just want to make sure we have the right budget.

THE COURT:  Yes.  I --

MR. LUZE:  Your Honor --

THE COURT:  Go ahead.

MR. LUZE:  Your Honor, what I would say in response is we just filed a revised form of order for the DIP order.

Obviously Mr. Millar's Declaration deals with the need for financing.  That budget is not intended to be binding on either of the financing parties.  The (indiscernible) the orders will be (indiscernible).

With respect to the DIP order, we had to -- we filed a revised order, 55, which hit a few minutes ago, Your Honor.

The buildup to the budget is the same.  It's the form of budget that's acceptable to Scania, and that's the only thing that changed about that order.  But we're ensuring that the correct version of the budget is attached to the DIP -- for the DIP order, Your Honor.

THE COURT:  Okay.  I had not -- obviously hadn't see that form of order.  But does that -- Mr. Talmadge, does that address your question?

MR. TALMADGE:  Absolutely, Your Honor.  Thank you.

THE COURT:  All right.  So I will admit the Declaration found at Docket Number 29.

Finally, the Declaration of Mr. Andrew Yearly, which is found at Docket Number 28, and that Declaration deals more with the marketing process, the comps, and the -- you know, the fact that in Mr. Yearly's professional opinion he believes that this is a market for this type of transaction.

As well as it goes into the -- you know, the various interplay between the cash collateral order and the DIP order.

So does anyone object to the Declaration of Mr. yearly found at Docket Number 28?

(No audible response.)

THE COURT:  Hearing none I will admit that.

(Docket Number 28 was received in evidence.)

THE COURT:  And does anyone have any cross-examination for Mr. Yearly?

(No audible response.)

THE COURT:  All right.  So hearing none I will -- just for the record, I will admit the Declarations found at Docket Number 4, 28, and 29 for the purposes of this hearing.

(ECF Nos. 4, 28 and 29 received in evidence.)

THE COURT:  Go ahead, Mr. Luze.

MR. LUZE:  Thank you, Your Honor.

If it will please the Court, I'm going to take the first two agenda items together.  And certainly we can walk through the orders separately to the extent Your Honor has questions.

The two motions are really an interrelated package of financing to fund the first portion of this case.  As Mr. Greco said, there is an additional process that is set forth in Mr. Yearly's Declaration.

There's an additional process that's ongoing to raise incremental DIP financing to bridge the company to its long-term recapitalization.

But the funds that will be made available pursuant to the cash collateral order and the DIP financing will fund the company's operations and the administration of these cases for a significant period of time while that process concludes.  And then we'll be back in front of Your Honor to approve the incremental DIP financing.

Just I think to set the table, Your Honor, about how these two financing packages fit together, as Your Honor saw in the first day Declaration and Mr. Greco's presentation, the company is organized basically as a parent company with a series of subsidiary silos.

The main operating silo is what we refer to as Ett.  It's Northvolt Ett AB and subsidiary.  That is where

the operating production facility sits in northern Sweden.

Within those entities is the secured debt, the only secured debt in the structure as we sit here today, so the DIP financing. And that is where the only cash collateral sits within the company.

In that silo there is approximately $1.7 billion of what is potentially Greensense project financing.

There's certain negative covenants that apply to grant a security interest (indiscernible) that applies sort of outside of that silo.

But primarily that is meant to be and is a Greensense project financing-type structure, 1.2 billion of first lien debt and about $500 million of second lien debt.

And so that is the silo primarily that the cash collateral arrangement relates to. And as I'll explain to Your Honor, the adequate protection is attaching to assets that today sit outside of that silo.

As it relates to the DIP financing that is being provided by Scania in the amount of (indiscernible) amount of hundred million dollars, $51 million of which is authorized pursuant to the interim order.

That entity will be taking collateral over what we referred to as the lab, which effectively the R and D function of the company. It is a sister silo to Northvolt Ett.

And that is the DIP lender's primary collateral; although as I'll explain in our interlocking collateral package it does relate to the DIP financing and the cash collateral arrangement.

Your Honor, with respect to cash collateral, so the primary cash collateral -- and as Mr. Greco says, this is primarily a liquidity-driven filing.

The company requires immediate access to funds that are today restricted, unavailable for use. It's not simply a contractual restriction. It's an agent authorization is required to release these funds.

After that restricted cash and access to incremental financing these parties were involved in the bridge financing discussions that were ongoing for sometime pre-petition and have elected to continue to support the company through the -- at least the first phase of this process.

The cash collateral is $110 million that -- approximately that sits in a debt service reserve account, which is a restricted account that is meant to support the Debtors' obligations to the secured lenders.

There's also what we refer to in the order as the revenue account which today contains approximately $28 million. Similar restrictions apply to that account.

Pursuant to the cash collateral order, Your Honor,

that entire amount will be released.

There is a $28 million holdback as it relates to DSRA funds that is being authorized pursuant to the interim order that is being released once the last piece of collateral is perfected, which I'll explain Your Honor.

But in the aggregate 138 or $135 million in the aggregate will be made available to the Debtors; $25 million, Your Honor, from the Ett silo is available to be up-streamed to the parent company, which we refer to AB, Northvolt AB.

The parent company provides -- obviously funds the other subsidiary silos but also provide sort of overarching management services and the like, some of which do benefit Ett, some of which benefit the other silos.

But it's separate from Ett, has its own employees, has its own payroll, has its own liquidity need.

And so a part of the negotiation with the lenders was allowing for a portion of those proceeds to be up-streamed out of their silo to sort of fund the broader enterprise, a portion of it to fund the broader enterprise.

The portions of the order, the cash collateral order that are unique to this situation relate to that hundred and ten million that's being released from the debt service reserve account.  That money is effectively there to ensure downside risks for these lenders.

In return for release of that money to fund this process they have asked for and we've negotiated effectively what is a replacement collateral package to support basically repayment of those funds.

And that collateral is taking -- taken in what we refer to as the lab systems Revolt and one that Mr. Greco didn't reference because it's no longer an operating subsidiary but does still have assets, including most significantly cash, commonly referred to as Fem, F-E-M.

That collateral is shared pledges over those entities and, in some instances, also include asset-level collateral. And that is the lender's primary collateral.

That's their first lien collateral over in connection with the DIP and cash collateral arrangement. And that supports only the 110 million that's being released pursuant to this order.

And it attaches as adequate protection lien for that amount under the construct set forth in this order.

The order does not contemplate cash pay adequate protection interest but it does contemplate PIC interest and some PIC fees that attach as incremental adequate protection claims and compensate the lenders for use of those funds.

With respect to the DIP facility, Your Honor, that hundred million is being funded at Northvolt AB, the parent company.

A portion of those funds will be down-streamed into Ett to fund ongoing operations at Ett, which is in the interest of the DIP lender, Scania, because they are most interested in supporting production.

It's somewhat of an unnatural thing certainly for a customer to provide DIP financing.  And we thoroughly appreciate Scania's participation in this and willingness to do this to continue to support the company.

But that hundred million, Your Honor, is the borrower's, Northvolt AB, collateral as provided in the lab subsidiaries.  And the lenders have a second lien over the primary DIP collateral.

And likewise the DIP lenders have a second lien over the collateral that is supporting the funds that are being released from the debt service reserve account.

And so it creates mirror collateral packages for that approximately $210 million that is being released to assist the Debtors and fund these cases at least through the first phase (indiscernible).

So those are the aspects of the orders that are maybe particular to this specific case, Your Honor.

The orders also contain provisions, you know, for example, more typical adequate protection-type liens for the lenders down in their subsidiary replacement liens for diminution in value.

Payment of professional fees, typical types of waivers and protections consistent with those types of protection have been approved in this district before.

And we would ask Your Honor that Your Honor approves these financing arrangements both on an interim basis. As I said, as relate to cash collateral, the full amount would be authorized day one.

There's a portion of it that will be released upon (indiscernible) incremental collateral which I didn't reference, Your Honor, but the incremental collateral is a shared pledge over the Debtors' subsidiary Canadian silo, which will attach once the required approvals have been received from the Canadian authorities, which the Debtors are working diligently to do.

So we expect that that full amount will be available in the coming days. Pursuant to the interim order the first $51 million tranche is authorized to execute the DIP credit agreement following this.

And then there's a funding schedule and confirming (indiscernible) and the like.

But sometime in the next several days that amount of money will be available as well. The lenders have agreed that immediately upon entry of the two orders the DSRA funds, the debt service reserve account funds, will be made available, including the 25 portion -- million dollar

portion that can be up-streamed.

That cash is critical, Your Honor, that that cash be available by tomorrow morning, open of business Sweden time, so that the company can work to fund payroll and get employees paid next Monday.

Without this relief the company wouldn't have had the necessary funds to make that payroll.  So that's been a critical driver in the timing of this filing and the timing of this hearing, and the need to get these orders entered today, Your Honor.

And as Mr. Greco said, we're thoroughly appreciative of Your Honor and chambers for accommodating us at this critical time.  If we'd gone into tomorrow, there's a chance that payroll would have been delayed.

And in an uncertain circumstances like a Chapter 11 that is likely familiar -- unfamiliar to a lot of these employees, it's important to demonstrate that the company is still there, we're still operating, and we're ensuring that people get paid.

So I will pause there, Your Honor.  I'm happy to walk through any portions of the proposed order that Your Honor has questions on.  I know they hit only an hour or so ago, so if there's specific provisions that Your Honor would like me to flag, happy to do that.

I would note those orders are attached to the

motions filed at 26, which is the cash collateral motion, and 27, which is the DIP.

A revised form of order reflecting only a swapped out form of budget acceptable to Mr. Talmadge's client was filed at Docket Number 55.

THE COURT:  All right.  I only had one question, and it's more I just wanted to make sure, you know, I did read through the orders.

And the way I understand it -- and just correct me if I'm wrong -- the only potential priming would result from the adequate protection liens on an -- on the unencumbered assets that the DIP lender is getting as a grant in order to make that; otherwise, there is really -- the way that I read it, there really isn't any other potential priming.

MR. LUZE:  Yeah.  So, Your Honor, that's largely correct, Your Honor.

There is sort of a technical priming aspect of this.  The collateral, the new collateral that's being granted, other than this sort of that I would say run-of-the-mill adequate protection-type collateral is being granted within it, is all unencumbered.

There is -- as it relates to Labs specifically, the parent company of Labs has a shared pledge for approximately $25 million related to some of the debt service reserve account funds that were released

pre-petition.  With the consent of the lenders they got that replacement collateral in return for that.

At that time, it was contemplated that Scania might come in for a financing out of court.  Obviously it's coming in as an in-court financing.

But the commercial deal with the Scania money would come ahead of that money.  To just be crystal clear, in the DIP order we provided that that is a priming DIP.  As it relates to that sort of small piece of collateral, that collateral will remain as a second lien.

And the lenders and Scania are working out the right form of intercreditor agreement.  As Your Honor might -- this collateral is primarily in Sweden.

We're also having to take all the (indiscernible) steps and the like to ensure that that's enforceable with applicable non-U.S. law.

But the -- as we sit here today, more than two-thirds of most of the first lien lenders and second lien lenders support entry of the cash collateral order also support that priming aspect of the Scania DIP.

THE COURT:  All right.  Let me first hear from the U.S. Trustee.  And then I'll -- I want to hear from Mr. Talmadge and the first and second lien lenders.

MR. NGUYEN:  Thank you, Your Honor.  Ha Nguyen for the U.S. Trustee.

I did get a advanced copy of the DIP and also the cash collateral advance but not that advanced, just this morning, Judge.

THE COURT:  You --

MR. NGUYEN:  (Indiscernible).

THE COURT:  -- you're a lucky man.

MR. NGUYEN:  I did have an opportunity to go through it.  Most of the releases are very routine.  There's no (indiscernible).  I think the financing package doesn't really overstep anything.  So for (indiscernible) Your Honor.  But we have no objection.

THE COURT:  All right.  Mr. Talmadge.

MR. TALMADGE:  Yes, Your Honor.  Can you hear me?

THE COURT:  Yes, I can hear you fine.

MR. TALMADGE:  Excellent.

First, nice to see you, Your Honor.  It's been a little while.  It's a pleasure to be in front of you.

Again, for the record, Scott Talmadge of Freshfields US, LLP on behalf of Scania.

Your Honor, as I mentioned, Scania is a Swedish manufacturer focusing on commercial vehicles, including trucks and buses.

Mr. Greco highlighted some of the advisors.  I just wanted to note that in addition to Freshfields, Scania is also represented by Hammarskiold, H-A-M-M-A-R-S-K-I-O-L-

D.   Took me a couple of days to be able to say that properly.  They are Swedish counsel, as well as SEB, who is our financial advisor.

Your Honor, as set out in the submissions by the Debtors and in support of obtaining the DIP financing, Scania is one of the Debtors' key customers.

Your Honor, the commercial relationship between Scania and the Debtors is a very important relationship for Scania, as reflected by the fact that Scania is providing DIP financing.

Scania is also obviously supportive of the overall restructuring efforts.

I want to highlight the fact again, Your Honor, that Scania is a manufacturer.  It is not a bank.  It is not a lender.

So rather to support the Debtors' restructuring efforts, Scania has made the determination to provide the DIP financing under the terms and conditions set forth in the DIP credit agreement, the other DIP loan documents, and the proposed interim order.

From Scania's perspective, the terms and conditions of the proposed financing are the result of very careful, very thorough arm's length negotiations, a lot of sleep lost in that process, a lot of effort on behalf of the respective management teams for the debtors of Scania and

their professional advisors.  And I think the relationship has been very productive.

We also worked at length with the professionals for the pre-petition secured lenders to ensure that the DIP loan provided for the DIP financing meshed with the proposed use of cash collateral.

And in all, Your Honor, Scania's hopeful that through the liquidity provided under the DIP, through the use of cash collateral the Debtors can stabilize and we all can work towards an overall successful restructuring of the businesses.

So on behalf of Scania, Your Honor, we would ask the Court approve the DIP financing and enter the form of interim order.

And of course, Your Honor, available for any questions you may have.

THE COURT:  Thank you.  Mr. Brod?

MR. BROD:  (No audible response.)

THE COURT:  Oh, I think I muted you.  Can -- no, I think I muted you and I can't for some reason unmute you. So would you mind calling back in and I'll take Ms. Eaton in the interim?

MR. BROD:  (No audible response.)

THE COURT:  Thank you.

(Pause)

44

MS. EATON:  Your Honor, Alice Eaton on behalf of the Ad Hoc Group of Second Lien Lenders at the Ett entity.

I'm going to say very little other than, you know, the requisite (indiscernible).  It's been a long two days.

And before I keep going, it's good to see you on the bench, Your Honor.

THE COURT:  Thank you.

MS. EATON:  Anyway, we have the requisite approval under our pre-petition documents for consent to the use of cash collateral.

And, you know, as Mr. Greco said earlier on, we're on board today.  There may be issues in the future.  We -- you know, hopefully we can potentially resolve all of them.

And, you know, we look forward to the company continuing its structuring efforts and seeking to raise incremental capital so we can have those discussions in an orderly fashion.

THE COURT:  Thank you very much.

All right.  Hopefully I've unmuted you.

MR. BROD:  (No audible response.)

THE COURT:  No, not yet.

MS. EATON:  So whatever my --

MR. BROD:  Your Honor?

MS. EATON:  My --

MR. BROD:  So you unmuted me --

MS. EATON:  My phone's been unmuted.  Your Honor, my phone became unmuted, not -- I don't know if Mr. Brod's did but my -- and I apologize, I should have introduced my co-counsel, Mr. Brookner, who is also on the phone.

THE COURT:  All right.

Mr. Brod, are you muted on your side?  Because -- what is your phone number?

MR. BROD:  (No audible response.)

THE COURT:  Well, I don't -- I'm going to just unmute every --

MR. BROD:  Can you hear me now, Your Honor?

THE COURT:  I can.  Go ahead.  I apologize.

MR. BROD:  Oh, no worries at all.  And for the record, Matthew Broad of Milbank, LLP on behalf of the pre-petition first lien secured parties.  I'll be brief, Your Honor.

We are supportive of entry of the attached (indiscernible) order, as well as entry of the DIP order approving DIP facility.

And to restate (indiscernible) Mr. Luze mentioned earlier, what's unique about this cash collateral arrangement is that the cash that we're talking about is in a restricted account today.

And so as a matter of local law and the current agency relationship, that cash cannot be used by the company

(indiscernible) debt service.

And so what is effectively happening, Your Honor, and this is the justification and the reason for some (indiscernible) but Mr. Luze (indiscernible) more broadly the adequate protection package is that the first lien lenders are providing a synthetic DIP facility.

And so I think it's more appropriate to think about this as the DIP facility new money, DIP financing coming from Scania, as well as cash, but otherwise (indiscernible) restricted account for the first lien lenders that is being released under (indiscernible) and for that reason we think the protections that are set forth in the order are appropriate under the circumstances.

But unless Your Honor (indiscernible) questions for me, I'm happy to cede the virtual podium.

THE COURT:  No.  I don't have any questions.

Anyone else wish to be heard?

(No audible response.)

THE COURT:  All right.  So I did review both -- the three Declarations that were submitted in support of the cash collateral order and the interim cash collateral order and the DIP order.  I asked the only question that I had.

I did review the various provisions.  And I did find them to be customary so I'm going to go ahead and approve them.

And so, Mr. Luze, when do you want a second day hearing?  I'll tell you if you want December 16th at -- or December 17th in the afternoon, those -- both those times are available.

That's about three weeks and three or four days. So we would have a full 21 days for the objection deadline and then we have the hearing four or five days later.

MR. LUZE:  Your Honor, let's do the 17th.

THE COURT:  Okay.  All right.  So we'll do the 17th at 1:00 a.m. for -- at 1:00 p.m., I'm sorry, for second day hearings.

All right.  Let me -- give me a minute and I will enter the orders because I think it's probably the most important thing I need to do today.

MR. TALMADGE:  Your Honor, if I could, apologies. You know, I'm literally waiting for confirmation from my financial advisor that everything tracks in the budget.  I tried looking at it very quickly while we were at the hearing.

I know it's important together -- for the Debtors to get it entered.  I would just ask -- I literally asked them a minute ago again just to confirm.  So I'm just waiting for that.

Perhaps we could go on to other matters.  I just want to get confirmation.  I want to make sure the right

budget is -- I understand that Mr. Luze has represented that.  I just need my FA to confirm that.

THE COURT:  All right.  So --

MR. LUZE:  Your Honor, there's no disagreement on the budget.  It was just a form issue (indiscernible) we filed.

I'm conscious of losing the folks in docketing.  It's important this order's entered tonight.  I'm fine to circle back to it after we go through one or two more agenda items whenever Mr. Talmadge has confirmation.

Otherwise, I can represent, Your Honor, that if the budget's not the exact correct one, we can file a notice (indiscernible) --

MR. SPEAKER:  (Indiscernible) don't worry about it.

MR. LUZE:  There's no substantive (indiscernible) --

MR. SPEAKER:  I'll get that (indiscernible).

MR. TALMADGE:  You know what, Your Honor, with that representation by counsel we're fine with --

MR. SPEAKER:  You here?

MR. TALMADGE:  -- you going ahead and entering the order because we recognize the urgency of it.  And if we (indiscernible) budget, we'll fix the budget.

MR. SPEAKER:  (Indiscernible).

THE COURT:  I'm going to have to mute the lines again.  And so I apologize but people need to hit pound seven again.  So I'm going to mute everyone.

(Pause)

MR. LUZE:  Looks like (indiscernible).

MR. TALMADGE:  Your Honor, --

MR. SPEAKER:  Can you hear me okay, Your Honor?

THE COURT:  Yeah.  I can hear you.

MR. TALMADGE:  Your Honor, with --

MR. LUZE:  Okay.

MR. TALMADGE:  -- Mr. Luze's representation that if we -- the budget is right, we'll go ahead and fix it, that's fine, you can go ahead and enter the order from our perspective.

THE COURT:  All right.  So give me a minute here.

Would people please mute their own phones?

MR. TALMADGE:  And, Your Honor, sorry to speak up again but I did just receive confirmation so there is no issue whatsoever.  Thank you.

THE COURT:  Okay.  Thank you.

(Counsel confer.)

THE COURT:  Please, everyone, mute their phones.

Mr. Luze, I'm going to set the objection deadline for the 18th of December.

MR. LUZE:  Your Honor, I thought we agreed -- did

we agree on the 17th for the hearing?

THE COURT:  Oh, I'm sorry, I'm sorry, you're right, you're right.  For the 11th of December.

MR. LUZE:  Eleventh of -- thank you, Your Honor.

(Counsel confer.)

(Pause from 5:09 p.m. to 5:11 p.m.)

THE COURT:  So I'm having a problem saving the interim cash collateral order.  It's now 5:11 Central Time.  Can we come back at, let's say, 5:25?  I want to make sure that I can get these documents in, and then we'll continue with the hearing.

So if everyone would just hang up on the -- and I'm having some problems with the conference lines.  Everybody hang up on that and call back in around -- in about ten minutes and we'll get started at 5:25.

MR. LUZE:  Thank you, Your Honor.

THE COURT:  Thank you.

(Recess taken from 5:12 p.m. to 5:29 p.m.)

THE COURT:  I think both orders have been signed.  The interim cash collateral has been entered and I think they're in the process of entering the DIP.  So those two things will get done.

And I had a little bit of glitch and we had to kind of redo it, that's what it took -- but I'm glad I took the time to get those two orders entered.

MR. LUZE:  We appreciate that, Your Honor.

With that, Your Honor, I will hand it to my colleague Ms. Ciara Foster (indiscernible) agenda items.

THE COURT:  Okay.

MS. FOSTER:  Good evening, Your Honor.  Ciara Foster of Kirkland and Ellis (indiscernible) Debtors.  The next item on the agenda is the Debtors' cash management motion filed at Docket Number 32.

Your Honor, as of the petition date the Debtors have approximately 159 accounts at nine banks in six countries which cumulatively hold nine different currencies.

Your Honor, the cash management system largely mirrors Northvolt's corporate structure (indiscernible) whereby Northvolt (indiscernible) provides centralized cash management services to the entire group with two master services agreements, intercompany loans, or capital contributions.

Northvolt's treasury department located in Stockholm maintains daily oversight over the cash management system, implementing cash management controls for accepting, processing, and releasing funds.

Each subsidiary also maintains its own cash management system centered around operating accounts (indiscernible) subsidiaries typically satisfy the entity's own ordinary obligations, including payroll, taxes, and

(indiscernible).

By this motion the Debtors seek authority to operate their global cash management system in the ordinary course, maintain existing bank accounts, business forms, and books and records, honor intercompany transactions, and pay related bank fees, including approximately 24,500 on account of fees outstanding as of the petition date.

Further, the Debtors also seek a grant of administrative expense status of post-petition intercompany transactions.

And, finally, the Debtors seek an interim extension of 45 days to comply with the deposit and investment guidelines set forth in Section 345(b) of the Bankruptcy Code.

Debtors worked closely with the United States Trustee finalize the release in advance of the hearing.  And the order reflects the United States Trustee's comments, including with respect to the 45-day extension.

Unless Your Honor has any questions, Debtor would respectfully requests entry of the order.

THE COURT:  I don't have any questions.

Mr. Nguyen, do you have any comments?

MR. NGUYEN:  Thank you.  Ha Nguyen for the U.S. Trustee.

No objection to this.  We did extend the deadline

to get 345(b) compliance with 45 days.  That's going to be a little bit of work as many of these bank accounts are foreign accounts.

And to get them collateralized is -- it's going to be very difficult.  But we'll work with the Debtors to make sure that 345(b) is complied with.

THE COURT:  All right.  I've reviewed the motion and the evidentiary support in the Declaration of Mr. Millar.  With the concurrence of the U.S. Trustee I will go ahead and enter the proposed form of order.  I have now signed it and it has gone to docketing.

MS. FOSTER:  Thank you, Your Honor.

THE COURT:  All right.  So go ahead.

MS. FOSTER:  Thank you, Your Honor.

Next item on the agenda is the Debtors' wages motion filed at Docket Number 13.

Your Honor, I want to echo the sentiments of my partner Mr. Greco, as well as Mr. Luze, and personally thank every employee at Northvolt for their relentless commitment, patience, and trust.

Northvolt's greatest asset is its people.  And it's been a privilege to work with them for over seven weeks.

Spent most of October in Stockholm so I've had the privilege of meeting many of the people who are going to be

subject to the relief in this motion.

Tomorrow morning I'll be meeting with Northvolt Union to update them on the outcome of today's hearing and thank you for their continued partnership.

Northvolt has over 6,000 employees, the overwhelming majority of whom are union members.  These members are technicians, machinists, scientists, engineers, and sales people, among others.

It is only through their support that Northvolt will reorganize and successfully emerge from Chapter 11.

We've shared the motion with the United States Trustee and worked through their comments in advance of today's hearing.

We filed a revised form of order shortly before the hearing at Docket Number 38, along with a redline at Docket Number 40 incorporating the United States Trustee's comments.

And for the record, Your Honor, these changes are twofold.  First, the change to paragraph three adding a notice requirement before making any non-insider bonus or severance payments in excess of a hundred thousand dollars or up to $50,000 to any individual.

Further, the Debtors removed language authorizing the payment of certain insider severance in paragraph four.

Your Honor, unless you have any questions, the

Debtors respectfully request entry of the order.

THE COURT:  All right.  Does anyone else wish to be heard?  Mr. Nguyen?

MR. NGUYEN:  Thank you, Your Honor.  Ha Nguyen for the U.S. Trustee.

I did see the revised proposed order that was filed right before the hearing.  I was happy to see that we (indiscernible) about severance for insiders on the first day.  So I appreciate the Debtors for taking that out of the order.

THE COURT:  All right.  I did review the order and I did review the couple of changes.  So I -- obviously this is a critical component of any restructuring.  So I will go ahead and sign the order.

All right.  Ms. Foster, the -- first of all, you're on the screen.  And, second, that the wages order has been signed and sent to docketing.

MS. FOSTER:  Thank you, Your Honor.  Unless you have anything further, I'll cede the podium to my colleague Ms. Reiney.

THE COURT:  Nothing further, thank you.

MS. REINEY:  Good evening, Your Honor.  Can you hear me okay?

THE COURT:  I can hear you fine, thank you.

MS. REINEY:  Great.  My name is Margaret Reiney,

from Kirkland and Ellis on behalf of the proposed Debtors.

I would like to take you to Docket Number 19, the Debtors' foreign vendors motion.  As noted by my colleagues, Northvolt develops and manufactures battery cells for the use in electric vehicles.

So as a result, Northvolt requires many raw materials, technical equipment, PPE, and other highly specialized vendor services.

In the months leading up to the filing, Northvolt worked actively with such suppliers to negotiate payment and delivery terms and (indiscernible) orders crucial to assure those vendors that they will continue honoring such obligation.

As noted, these vendors are highly specialized and critical to maintain operation.

On an interim basis we are seeking approval of $48 million, and then $112 million on a final basis.

Unless Your Honor has any questions, we have incorporated a few comments from the U.S. Trustee as well.

THE COURT:  Mr. Nguyen.

MR. NGUYEN:  No objection, Your Honor, thank you.

THE COURT:  All right.  I did review the foreign vendor motion, although it's referred to as the trade motion, but I did review that.

Obviously keeping vendors happy and being able to

continue to manufacture is key, so I will go ahead and enter that order.

MS. REINEY:  Great.  Thank you, Your Honor.

THE COURT:  Hold -- give me a minute here.  Okay. That has been sent to docketing.

MS. REINEY:  Great.  Thank you so much.

Next I'd like to take the Court to the Debtors' automatic stay motion at Docket Number 14.  This motion seeks an entry of an order restating and enforcing the worldwide automatic stay.

Given the operations of the Debtors, you know, largely in Sweden, it's likely that many creditors are unfamiliar with the automatic stay and its application.

Therefore, this order seeks to notify such parties of the stay.  And we believe the motion and proposed order simply restates the protections under Section 362 of the Bankruptcy Code.

Unless the Court has any questions, we would respectfully request entry of the order.

THE COURT:  Okay.  Anyone else wish to be heard?

(No audible response.)

THE COURT:  All right.  I did review the order. And I do agree that this basically restates what the automatic stay is.  These are typical in cases where there's a lot of foreign parties.

Specifically in paragraph four it doesn't expand the rights under 362.  And on paragraph eight it reiterates the exceptions to the stay and allows everyone to seek relief.

I think this is a proper exercise of the Debtors' business judgment, and I will go ahead and enter -- sign the order.

MS. REINEY:  Great.  Thank you, Your Honor.

THE COURT:  All right.  Give me a minute here.  All right.  That has been signed and sent to docketing.

MS. REINEY:  Thank you so much.

Next I would like to take the Court to Docket Number 30.  This is the Debtors' creditor matrix motion.

This motion seeks request -- or requests entry of an order authorizing the Debtors to file a consolidated creditor matrix, consolidated list of the top 30 unsecured creditors, redact personally identifiable information of natural person, and approve the form and manner of notifying creditors of the commencement of these cases.

We think this is necessary given the significant administrative burden that it would cost the Debtors estates to administer the notices on a non-consolidated basis.

And the redaction of personally identifiable information is crucial not only for the safety of the individuals but also because of the worldwide operation and

the GDCR considerations.  We understand there are considerable fines if a violation is said to have occurred.

So we would respectfully request entry of the order, and happy to answer any questions that Your Honor may have.

THE COURT:  No.  I read the motion.

Mr. Nguyen.

MR. NGUYEN:  No objection, Your Honor.

THE COURT:  Okay.  I did read the motion.  I am generally aware of the various privacy laws in the EU, so I think this is an appropriate exercise of the Debtors' business judgment.  So I will go ahead and -- so that order has been signed and sent to docketing.

MS. REINEY:  Great.  Thank you so much, Your Honor.

Unless Your Honor has any questions, I would like to cede the podium, virtual podium my colleague Jimmy Ryan.

MR. RYAN:  Good evening, Judge.  Can you hear me okay?

THE COURT:  I can hear you fine, sir.

MR. RYAN:  Great.  For the record, Jimmy Ryan of Kirkland and Ellis, proposed counsel to the Debtors.

I'll be taking you through the balance of today's agenda, starting with the Debtors' taxes motion which was filed at Docket Number 33 and is agenda item number eight.

Your Honor, the taxes motion seeks customary relief to pay taxes in the ordinary course of business and to pay approximately $21.6 million (indiscernible) pre-petition amounts owed.

We shared the motion and the order with the Office of the United States Trustee; believe we're moving forward on a fully consensual basis.

So unless Your Honor has any questions, I request that you would enter the proposed form of order.

THE COURT:  Mr. Nguyen, any comments?

MR. NGUYEN:  No, Your Honor, thank you.

THE COURT:  All right.  Anyone else wish to be heard?

(No audible response.)

THE COURT:  All right.  I find this is an exercise of the Debtors' business judgment.  Obviously the taxes are going to need to be paid.  For the most part they constitute priority expenses.  So I will go ahead and sign that order.

MR. RYAN:  Thank you, Your Honor.

THE COURT:  All right.  Give me one minute here.  All right.  That has been signed and sent to docketing.

MR. RYAN:  Great, thank you.

The next item on the agenda is the Debtors' utilities motion.  The utilities motion was filed at Docket Number 21.  It is number nine on the agenda.

Your Honor, the utilities motion likewise seeks customary relief to establish adequate assurance procedures and to set up an adequate assurance account to ensure future payment for utility providers.

We shared this order with the United States Trustee in advance of today's hearing, and we incorporated their comments, and likewise believe we're moving forward here on a fully consensual basis.

And so if you have any -- unless you have any questions, I respectfully request that you enter the proposed form of order.

THE COURT:  No questions from me.  Mr. Nguyen, any comments?

MR. NGUYEN:  No, Your Honor, thank you.

THE COURT:  All right.  This is a customary utilities order.  I -- just as a complete aside, I think it's going to be interest to see how you enforce this in foreign jurisdictions.  But this is a standard form of order that should be enforceable, so I will go ahead and sign it.

MR. RYAN:  Thank you, Your Honor.

(Pause)

THE COURT:  All right.  It has been signed and sent to docketing.

MR. RYAN:  Thank you.  Your Honor, the next item on the agenda is the Debtors' insurance motion which was

filed at Docket Number 22 and is item number ten on the agenda.

Your Honor, the insurance motion likewise seeks customary relief to continue to honor their insurance and surety bond programs in the ordinary course, and to pay any pre-petition amounts owed thereto.

We likewise shared this motion with United States Trustee's Office in advance of today's hearings and incorporated their comments. And so again we believe we're moving forward here on a fully consensual basis.

So unless you have any questions, we would respectfully request that you enter the proposed form of order.

THE COURT: Mr. Nguyen.

MR. NGUYEN: No comment, Your Honor. Thank you.

THE COURT: All right. I did review the insurance motion and I find it to be, again, an appropriate use of the Debtors' business judgment.

Obviously having insurance is critical to its ongoing operations, so I will go ahead and approve the -- sign the order. And it has been sent to docketing.

MR. RYAN: Thank you, Judge.

The next item on the agenda is the Debtors' schedules and statements extension motion which was filed at Docket Number 17 and is item number 11 on the agenda.

This motion likewise seeks customary relief.  And we're seeking an extension here of 45 days of the 14-day deadline to file the schedules and statements.  I believe that date would bring us to January 21st, which is the day after Martin Luther King Day.

We're also seeking an extension to extend the deadline to file the 2015 reports to the same day, January 21st.

We shared this motion with the United States Trustee's Office and they didn't have any comments, and so I think we're moving here on a fully consensual basis.

So unless you have any questions, we respectfully request that you enter the order.

THE COURT:  No questions here.  Mr. Nguyen?

MR. NGUYEN:  Nothing from the U.S. Trustee, Your Honor, thank you.

THE COURT:  All right.  This -- again, this is a relatively standard first day motion so I am going to go ahead and sign the order and send it -- it's been sent to docketing.

MR. RYAN:  Thank you, Judge.

Your Honor, the last item on the agenda is the customer contracts motion which was filed at Docket Number 15 and is item number 12 on the agenda.

Your Honor, this motion seeks to continue to honor

the Debtors' existing customer contracts which obviously are crucial to the Debtors' business.  The customer contracts are expected to generate approximately $5.5 billion in revenue over the course of their life.

And so, you know, we shared this draft with the United States Trustee's Office in advance of the hearing and they did not have any comments, and so, again, moving here forward on a fully consensual basis.

Unless you have any questions, we respectfully request that you enter the proposed form of order.

THE COURT:  Mr. Nguyen.

MR. NGUYEN:  Nothing from the U.S. Trustee, Your Honor, thank you.

THE COURT:  All right.  I believe obviously that this is a exercise of the Debtors' business judgment, appropriate exercise.

Not being able to -- actually not having such an order, that would jeopardize the revenue, would seriously imperil any reorganization possibility.  So I will definitely go ahead and sign the order.

All right.  So the order has been signed and sent to docketing.

MR. RYAN:  Thank you, Judge.

I believe that concludes today's hearing.  Just wanted to thank the Court for taking the time on such short

notice.  And we'll be back in front of Your Honor in a few weeks.

THE COURT:  Thank you.  And appreciate all the hard work and, you know, having a relatively -- almost entirely consensual hearing.

I do appreciate the work that -- and the efforts of the U.S. trustee and the various parties, and look forward to the next hearing.

I think -- I expect that all the orders will be entered today and we can go from there.

MR. RYAN:  Great, thank you, Judge.

THE COURT:  All right.  If there's nothing further, you all may be excused.

(Proceeding adjourned at 5:52 p.m.)

*  *  *  *  *

*I certify that the foregoing is a correct transcript to the best of my ability due to the condition of the electronic sound recording of the ZOOM/video/telephonic proceedings in the above-entitled matter.*

*/S/ MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*

*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #69362*

*DATE FILED:  NOVEMBER 30, 2024*